# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SIRA CRUZ,<br><br>                   Plaintiff,<br>  vs.<br>UNITED STATES OF AMERICA, et al.,<br>                   Defendants. | CASE NO. 14cv2956-LAB (DHB)<br><br>**ORDER GRANTING SUMMARY JUDGMENT** |

"There are good reasons not to call an opponent's argument 'ridiculous.'" "The reasons include civility; the near-certainty that overstatement will only push the reader away . . . and that, even where the record supports an extreme modifier, the better practice is usually to lay out the facts and let the court reach its own conclusions." *Bennett v. State Farm Mut. Auto. Ins. Co.*, 731 F.3d 584, 585 (6th Cir. 2013). Sira Cruz calls Defendants' arguments "perverse," "absurd," "nonsensical," and "intellectually dishonest." But as Judge Kethledge observed in *Bennett*, there's a more important reason for avoiding the hyperbole in this case: the arguments that Cruz "derides" are "instead correct." *Id.*

## Summary

Sira Cruz fell down a ladder entrance while working in a tank on board the USS Makin Island. She blames general contractor National Steel and Shipbuilding Company (Nassco[1]) for failing to cover the entrance. She blames subcontractor Peterson Scaffolding for installing scaffolding too close to the entrance. Nassco and Peterson moved for summary judgment.

---

[1] The Court lowercases the "Nassco" abbreviation wherever it appears for readability.

The Court needs to resolve two issues. First, the Longshore and Harbor Workers' Compensation Act provides the exclusive remedy for injured maritime employees to recover from their employer. Tradesman International, a staffing agency, sent Sira Cruz to work for Nassco for two years. Nassco trained, supervised, and directed Cruz to perform work on the Makin Island. Does the Longshore Act immunize Nassco from suit as Cruz's employer?

Second, under maritime law, parties can recover for negligence when a defendant breaches a duty of reasonable care. Peterson installed scaffolding in accordance with specific plans from Nassco a month before Cruz entered the tank. Can Cruz sue Peterson for negligence?

**Background**

About six years ago, Nassco contracted with Tradesmen for additional workers to help repair ships. Nassco paid Tradesmen, and Tradesmen paid the workers. In October 2010, Tradesmen sent Sira Cruz to work for Nassco. She started as a *fire watch*, but eventually, Nassco agreed to provide her on-the-job training as a *tank tester*—someone who climbs into potable water and ballast tanks on ships to inspect welding to ensure there's no leaks. Cruz worked for Nassco for over two years.[2]



In early 2013, Nassco was repairing the Makin Island, an amphibious assault ship in the Pacific Fleet docked at the Naval Station in San Diego. On January 10, 2013, Peterson installed scaffolding in a tank on the Makin Island according to Nassco's specifications so repair work could be done on a device at the top of the tank. Nassco began using the scaffolding and inspected the tank daily for unsafe conditions. About a month later, Nassco directed Cruz to work in the same tank to carry out her tank-testing duties.

---

[2] Dkt. 53 (Undisputed Facts–Nassco and Cruz); Dkt. 47-2 (Lawrence Decl.); Dkt. 47-3 (Nassco-Tradesman Terms).

The day before her fall, Cruz traversed the two ladder entrances, also known as baffle holes, and brought equipment down to the bottom of the tank.[3] The next day, February 20, 2013, Cruz again entered the tank and safely navigated the ladders. When she returned to the tank after lunch, however, Cruz took a misstep on the landing, and fell 12 feet down the entrance to the second ladder.[4]

Cruz sued Nassco and Peterson for her fall under maritime law.[5] She says that Nassco should have covered the ladder entrance and that Peterson's scaffolding "effectively created a channel to guide workers into the unguarded deck hole." Cruz has already received at least $68,000 for her injuries under the Longshore Act.[6]

## Legal Standard

The summary judgment standard is well known: when the moving parties show that no genuine dispute as to any material fact exists, they're entitled to judgment as a matter of law. Fed. R. Civ. P. 56. The Court doesn't "weigh the evidence and determine the truth of the matter" at this stage, but it does view the evidence in the light most favorable to the nonmoving party. The Court must grant summary judgment when there isn't enough evidence "for a jury to return a verdict" for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

## Analysis

**I.    The Longshore Act bars Cruz from suing Nassco.**

Nassco says that since Cruz was a *borrowed employee*, the Longshore Act bars her negligence claim against Nassco. Cruz argues that she wasn't Nassco's employee because (a) she "was never under the control or supervision of Nassco"; and (b) Nassco waived the borrowed employee doctrine by signing a contract that said Tradesman's workers wouldn't

---

[3] The parties refer to the deck opening as a baffle or lightening "hole." The Court recognizes the opening serves to disperse water in the tank, but opts for ladder "entrance" or "opening" since that's how Cruz was using the space.

[4] Dkt. 53; Dkt. 54 (Undisputed Facts–Peterson and Cruz); Dkt. 50-4 (Cruz Depo.).

[5] Cruz dismissed her actions against the United States as shipowner. Dkt. 42.

[6] Dkt. 52 at 3 (Opposition to Peterson); Dkt. 47-2 at 5.

be considered Nassco employees. The Court disagrees.

### A.  Nassco controlled Cruz.

Under the Longshore Act, workers injured on the job may receive compensation. But the Act is the exclusive remedy—the worker can't also sue the employer for damages. 33 U.S.C. 905(a). Nassco says Cruz can't sue them because she qualifies as a borrowed employee (older cases use *borrowed servant*). Therefore, Cruz was protected by the Longshore Act, and she's already been compensated for her fall.[7]

Under the borrowed employee doctrine, "When one person puts his servant at the disposal and under the control of another for the performance of a particular service for the latter, the servant, in respect of his acts in that service, is to be dealt with as the servant of the latter and not of the former." *Denton v. Yazoo & M.V.R. Co.*, 284 U.S. 305, 308 (1931). Determining which company had "authoritative direction and control" provides "the critical factors by which the borrowed servant issue is to be determined." *Parker v. Joe Lujan Enterprises, Inc.*, 848 F.2d 118, 120 (9th Cir. 1988).[8]

The Court finds that Cruz was a borrowed employee: Nassco controlled Cruz by commanding her to carry out Nassco work. For at least two years before her accident, Cruz worked almost exclusively for Nassco. At the start of each day, Cruz attended a "meeting led by Nassco employees where the tasks to be performed would be discussed." Cruz *only* became a tank tester because Nassco's Ignacio Navarro agreed to train and promote her to the position. Navarro testified that Nassco taught Cruz "how to perform the required tasks" of a tank tester and that she was expected "to perform her job" "under the supervision of Nassco employees"—specifically, Ignacio Navarro, Arturo Higadera, and Efren Murguia. Cruz admits that Higadera instructed her on "how to do her job as a tank tester" and "without

---

[7] "While the Ninth Circuit has not specifically applied the borrowed servant doctrine as a defense under" the Longshore Act "it recognizes the doctrine in other contexts." Many other courts have. *See Burnette v. Sierra Nevada Corp.*, 2015 WL 5475262, at *6 (D. Ariz. Sept. 18, 2015) (collecting cases).

[8] Cruz says *Ruiz v. Shell* "is the controlling modern federal case on the borrowed servant doctrine." Many courts have used *Ruiz's* factors to help analyze the issue, but the Court isn't aware, and Cruz hasn't identified, any Ninth Circuit case law that requires the Court to march through the nine-factor test. Although that analysis also counsels in favor of Nassco, *Denton* and *Lujan* provide sufficient, and binding, guidance.

these instructions she would not have known how to do the work." The day of her accident, Nassco supervisors, including Higadera, gave Cruz "instructions to work on the tank."[9]

Courts have found that workers like Cruz were borrowed employees where the second employer exerted much less control than Nassco. *See, e.g.*, *Parker*, 848 F.2d at 118 (9th Cir. 1988) (winch operator borrowed employee despite working in original company's winch truck); *McCollum v. Smith*, 339 F.2d 348 (9th Cir. 1964) (crane operator borrowed employee of construction firm that rented "operator in order to do some work of their own and in their own fashion"); *Denton*, 284 U.S. at 305 (1931) (railroad worker borrowed employee of United States while loading mail onto train under direction of postal clerk).

Cruz cites language from *Standard Oil v. Anderson* where the Court quoted Justice Holmes's proposition that "the mere fact that a servant is sent to do work pointed out to him by a person who has made a bargain with his master does not make him that person's servant." *Standard Oil Co. v. Anderson*, 212 U.S. 215, 226 (1909). But the application of the borrowed employee doctrine here aligns with Holmes's position: Nassco didn't *merely* send Cruz to work on the tank—Cruz was only *capable* of the work because Nassco spent six months teaching her how to test tanks.[10]

Cruz only submitted one piece of rebuttal evidence: her own five-page declaration that offers conclusory allegations that contradict the parties' undisputed statement of facts. The declaration isn't reliable evidence that creates a material issue of fact. *Yeager v. Bowlin*, 693 F.3d 1076, 1080 (9th Cir. 2012) (affirming summary judgment on sham declaration).

For example, compare Cruz's statement that Nassco "did not direct or control my activities" with her admission that Nassco "negligently directed [her] to work in the tank." Or her statement that, "No one from Nassco ever tried to tell me how to conduct my tank tester assignments" with her admission that she "received instructions on how to do her job as a

---

[9] Dkt. 53; Dkt. 47-6 (Navarro Decl.).

[10] *Standard Oil* distinguished between two scenarios where a company like Tradesman (i) contracts "to perform the work through servants of his own selection, retaining the direction and control of them" (the case in *Standard Oil*); and (ii) where the company "furnishes [workers] to do the work, and places them under [another company's] exclusive control in the performance of it, those [workers] become pro hac vice the servants of him to whom they are furnished." (The case here.) *Id.* at 254.

tank tester from Nassco employee Arturo Higadera; without these instructions she would not have known how to do the work." Cruz also testified that Higadera would tell her the tank number, the type of equipment needed, and the work that needed to be done. Cruz says she used her own tools, but testified that she brought Nassco equipment down into the tank. Cruz says her work with Nassco was "temporary" and she "always considered [herself] to be an employee of Tradesman and not an employee of Nassco." She testified, however, that she didn't have supervisors from Tradesmen, "worked with the people that work in Nassco," and her own Facebook page identifies her "Work" as "Nasco - March 2008 to present."[11]

Cruz tries to draw a distinction by arguing that she was a skilled employee and Nassco didn't control *how* she performed the details of each assignment. *See, e.g.*, *Kowalski v. Shell Oil Co.*, 23 Cal. 3d 168, 176 (1979). But that argument doesn't make sense here: Cruz was only capable of testing tanks because Nassco taught her how to test tanks.

She also argues that Tradesman paid her and had the ultimate right to fire her. But she admits that Nassco could "terminate temporary labor at any time" and was in control of approving Cruz's vacation requests.[12] But getting paid or fired by Tradesman, or using her own tools, doesn't show that Tradesman was commanding her to do its work when she was in the tank: the Court need not find "that the general employer relinquish[ed] full control over his employee," or that Cruz was "completely subservient" to Nassco, to find that she was a borrowed employee. *McCollum,* 339 F.2d at 351. Rather, Nassco's authority only needed to extend "over the servant's performance of the particular work in which he is engaged at the time of his negligent act." *Id.*

**B.     Nassco didn't waive the borrowed servant doctrine**.

Cruz's only card is Nassco's standard purchase order with Tradesmen. She says that based on the terms of the purchase order, Nassco waived the borrowed servant defense. "Obviously parties to a contract cannot automatically prevent a legal status like 'borrowed employee' from arising merely by saying in a provision in their contract that it cannot arise."

---

[11] *See* Dkt. 51-1 (Cruz Decl.); Dkt. 53; Dkt. 47-10 at 98-101 (Cruz depo.); Dkt. 67-3 (Facebook posts).

[12] Dkt. 53.

*Melancon v. Amoco Prod. Co.*, 834 F.2d 1238, 1245 (5th Cir. 1988). That principle wasn't obvious to Cruz; it was her main argument.

Nassco's "Terms and Conditions for Labor Providers" states that "Seller's employees are not to be construed as agents or employees of Nassco."[13] But the Court considers the "reality at the worksite and the parties' actions in carrying out a contract" which can "impliedly modify, alter, or waive express contract provisions." *Melancon*, 834 F.2d at 1245; *see also Kowalski*, 23 Cal. 3d at 176 (1979) (finding worker wasn't borrowed employee, but reversing court for relying on express contract provision rather than the actual relationship between worker and company). Based on the evidence of borrowed employee status discussed above, the Court finds that's the case here as well.

Nassco also mustered testimony from Tradesman's general manager. He explained that Tradesmen's expectation was "that the laborers will do the work which Nassco directs them to do." Laborers like Cruz receive their "instructions from Nassco" and "the work being performed is Nassco's work, not the work of Tradesmen." Tradesman just supplies labor. It doesn't "provide any job training specific to shipbuilding" or "materials or equipment" necessary for tank-testing, or even supervisors: "Cruz would have received her instructions from and be supervised by Nassco employees, not employees of Tradesmen."[14]

Cruz argues that failing to enforce the contract provision would allow Nassco "to escape tort liability [and] would be a disincentive for safety and would be against public policy."[15] But the contract provided for Longshore Act insurance so that if workers like Cruz were injured, she would be compensated. "The fundamental purpose of the Act is to compensate employees" who sustain damages "because of injury." *Metro. Stevedore Co. v. Rambo*, 515 U.S. 291, 298 (1995). Cruz was compensated for her injuries. Public policy isn't served by giving her a second chance to collect for the same injuries again.

/ / /

---

[13] Dkt. 47-3.

[14] Dkt. 47-2 at 3-5.

[15] Dkt. 51 at 8.

## II. Peterson didn't have a duty to protect Cruz from falling.

Cruz says that Peterson's responsible for her fall as well. Since Cruz "was injured aboard a ship upon navigable waters," "the standards of maritime law" apply. *Kermarec v. Compagnie Generale Transatlantique*, 358 U.S. 625, 628 (1959). But maritime negligence is essentially the same as under the common law: duty, breach, causation, and damages. *Samuels v. Holland Am. Line-USA Inc.*, 656 F.3d 948, 953 (9th Cir. 2011). And the Court has a duty to "endeavor to determine the issues in accordance with the substantive law of the State." *Hess v. United States*, 361 U.S. 314, 319 (1960). While negligence often turns on questions of fact that should go to the jury, the "existence and extent of a duty of care are questions of law." *Martinez v. Korea Shipping Corp.*, 903 F.2d 606, 609 (9th Cir. 1990).

The basic problem here is that Cruz admitted that *Nassco* was responsible for covering the ladder entrance, and, that *Nassco* was responsible for the precise placement of the scaffolding. Cruz's admissions have resolved the key issues of fact. Regardless, the Court finds that there are four independent reasons that Peterson didn't owe a duty to a non-employee who fell down a ladder entrance next to its scaffolding.

### A. Peterson didn't owe Cruz a duty to cover the entrance or to place the scaffolding in a different location.

#### 1. Peterson wasn't obligated to protect nonemployees from falls.

Peterson owed Cruz "the ordinary negligence duty of reasonable care under the circumstances." *Peters v. Titan Nav. Co.*, 857 F.2d 1342, 1344 (9th Cir. 1988). Cruz's main argument is that Peterson didn't act reasonably because it failed to comply with Federal OSHA regulations that require fall protection around deck openings.[16] The Ninth Circuit, however, has explained that under the OSHA regulations, "It is *employers* of workers who are obliged to protect deck edges with railings or to provide other protection against falls" "for it is they who are in the best position to judge what is needed for safe operations." *Ralston v. San Juan Excursions, Inc.*, 252 F. App'x 180, 182 (9th Cir. 2007) (emphasis in original)

---

[16] "When *employees* are working around open hatches . . . the edge of the opening shall be guarded." 29 C.F.R. 1915.73(c)(emphasis added); Dkt. 51 at 5; Dkt. 52 at 4.

29 C.F.R. § 1915.3(a), (b).[17] Peterson didn't owe Cruz a duty to provide fall protection; her employer, Nassco, did. And the problem for Cruz, is that both Nassco and Cruz admit as much.

Cruz agreed it was undisputed that "Nassco and not Peterson, was responsible for providing guarding for such holes and the responsibility for ensuring the hole was covered on the day of the incident lay with Nassco." Cruz agreed that Nassco "did not require Peterson to take any action with respect to the Hole" and "did not expect Peterson to notify it about the existence of the Hole."[18] Despite those admissions, Cruz's opposition argues that "it is undisputed that Peterson failed to cover the holes as required by its Nassco contract." Cruz also argues that Peterson didn't comply with its own safety regulations.[19]

First, it's true that Nassco's standard fall protection regulations say that deck openings like the ladder entrance should be covered or guarded. Nassco's safety expert, Bart Deem, agreed that these fall protection provisions were attached to the purchase order Nassco sent to Peterson and that Peterson was expected to comply with Nassco regulations.[20]

But Deem says covering the entrance wasn't the only way Peterson could comply with Nassco's safety regulations. He testified that Peterson complied by having its employees "wearing harnesses" "in lieu of covers." Deem said that based on his "30 years" as a "safety rep," wearing harnesses would satisfy Nassco regulations (and OSHA). More important, he testified that his company didn't expect Peterson to cover the ladder entrance—it expected "them to build scaffolding." He said *Nassco* was responsible for making any "decision as to who would initiate covering that hole." [21]

---

[17] Cruz doesn't distinguish *Ralston*, but argues that shipowner liability cases (like *Ralson*) shouldn't guide the Court because the duties are different. The plaintiff in *Peters* made the same argument. The Ninth Circuit explained that since a shipowner owes the same "duty of reasonable care," negligence claims against shipowners were "instructive on the limits of negligence liability in suits against other defendants." *Peters*, 857 F.2d at 1345.

[18] Dkt. 54 nos. 35–38.

[19] Dkt. 52 at 21.

[20] Dkt. 52-6 at 21-22 (Deem Depo.).

[21] Dkt. 52-6, Ex. 43; Dkt. 52-6 at 19, 21–22, 85, 101,132.

Cruz submits an email exchange from Peterson employees as evidence that "the hole was visible to Peterson employees and they were aware of its danger."[22] But the email actually bolsters the position that Peterson *didn't* need to put up fall protection. In that email, Peterson's maritime manager, Eric Raymond, wrote: "We were not tasked with installing fall protection only [with providing] access [to] the vent opening. We had asked [Nassco] if they wanted us to install fall protection but they did not want to pay for it."[23]

Second, Cruz says Peterson's own regulations created a duty to protect her from falling. Cruz cites a section from Peterson's injury prevention manual on fall protection that says, deck "openings shall be covered and marked." But the opening stanza in this section is directed at *employees*: "Only fall protection that meets or exceeds the applicable ANSI or ASTM Standards shall be utilized by *Company Employees*." The policy also states that "Recognition of a fall hazard is the key factor in preventing *Peterson Employees* from being hurt by falling."[24] Cruz protests that, "Peterson's perverse view of OSHA would lead to complete chaos in the maritime industry." But that's the view articulated by the Ninth Circuit in *Ralston*.

As with the Nassco-Tradesman contract discussed above, Cruz's best evidence for connecting her fall to Peterson is a provision in the Nassco regulations. But finding a boilerplate safety clause doesn't create a triable issue of fact when everyone else involved, including Cruz, says that Nassco was responsible for putting up protection around the ladder entrance–not Peterson.

### 2. Peterson's isn't negligent for placing the scaffolding where Nassco instructed.

Both Nassco and Cruz also agreed that Peterson installed the scaffolding "pursuant to Nassco's specifications" and it "could only be placed in that specific location." The picture

---

[22] Dkt. 52 at 22.

[23] Dkt. 54-3; Dkt. 52-6, Ex. 39.

[24] Dkt. 52-7, Ex. 59 at § 6 (emphasis added). Cruz doesn't raise this point, but the introduction to the policy states that Peterson will make all reasonable efforts to "provide information and safeguards for other contractor's employees." *Id*. at § 1. But this aspirational language doesn't create a legal duty.

above shows the yellow tape marking the spot where Nassco determined the scaffolding needed to be placed in the tank. But Cruz looks at that picture and concludes: "Peterson effectively created a channel to guide workers into the unguarded deck hole."[25]

Cruz attempts to corroborate this overstatement with a declaration from Carl Beels, a "human factors and safety expert," who concludes that the "placement of the scaffold" made the ladder entrance "even more dangerous."[26] But where "the contractor performs the work pursuant to the plans and specifications without negligence, then the contractor is not liable." *Hamilton v. Harkins*, 146 Cal. App. 2d 566, 574 (1956).

Even granting Beel's testimony that the scaffolding placement was dangerous, where "the plans and specifications are inherently dangerous because of facts the contractor does not know and of which he is not chargeable" then he's not liable. *Id.* Here, John Cogburn testified that when Peterson bid on the scaffolding job, Nassco's specifications didn't include any provision for covering holes in the tank.[27] Peterson knew it had to put up scaffolding so Nassco could reach a device at the top of the tank. It didn't have any knowledge about how or when Nassco would put up fall protection.

There's no need to get lost in legal doctrine here because the point is intuitive: Cruz didn't fall when a rung gave way as she climbed the scaffolding. She fell down a ladder entrance that she's admitted Nassco was responsible for covering. She can't blame Peterson for crowding her path by building scaffolding exactly where Nassco told them to build it.

**B.    Peterson didn't owe Cruz a duty because Nassco accepted the scaffolding.**

The Court also finds that Peterson didn't owe Cruz a duty because before she started work in the tank, Nassco had already accepted the scaffolding and put it into use. "When a contractor completes work that is accepted by the owner, the contractor is not liable to third parties injured as a result of the condition of the work, even if the contractor was negligent in performing the contract, unless the defect in the work was latent or concealed." *Neiman*

---

[25] Dkt. 54 nos. 11-13, 33-34.

[26] Dkt. 52-3 (Beels Decl.).

[27] Dkt. 50-10 at 15, 19 (Cogburn Depo.).

*v. Leo A. Daly Co.*, 210 Cal. App. 4th 962, 969 (2012) (alterations omitted). California courts have granted summary judgment against injured plaintiffs like Cruz that sue a subcontractor for injury allegedly caused by work that's already been completed and accepted by the general contractor. *See, e.g., Jones v. P.S. Dev. Co.*, 166 Cal. App. 4th 707, 711 (2008); *Sanchez v. Swinerton & Walberg Co.*, 47 Cal. App. 4th 1461, 1471 (1996).

Cruz agrees that "Peterson installed the scaffolding on January 10, 2013 pursuant to Nassco's specifications." She agrees that "Nassco placed Peterson's scaffolding into use, and inspected the tank for unsafe conditions daily until the incident" on February 20, 2013. And she's admits that when she entered the tank, the ladder entrance was "obvious," she had no problems navigating the ladders despite the scaffolding, and her opposition admits this "case does not involve a latent defect."[28]

Cruz says the accepted work doctrine shouldn't apply because maritime law is historically more protective of injured plaintiffs, so "bringing this foreign common law concept into the realm of maritime law undercuts its very purpose."[29] Cruz cites *Kermarec*, which says the Court must declare "the general maritime law, free from inappropriate common-law concepts." *Kermarec*, 358 U.S. at 630. Cruz stands on this single sentence and proclaims that *Kermarec* "plainly prohibit[s]" application of the accepted work doctrine. *Kermarec* says no such thing.

The logic behind the accepted work doctrine turns on the idea "that an owner has a duty to inspect the work and ascertain its safety, and thus the owner's acceptance of the work shifts liability for its safety to the owner, provided that a reasonable inspection would disclose the defect." *Neiman*, 210 Cal. App. 4th at 969 (quotations omitted). That same concept applies here: Nassco inspected the scaffolding, put it into use, and accepted the transfer of liability. The Court doesn't spot anything about the maritime context that makes this doctrine inappropriate. *See Morton v. De Oliveira*, 984 F.2d 289, 291-92 (9th Cir. 1993) (finding "widely adopted" tort rule that couldn't "be traced to obsolete concepts regarding real

---

[28] Dkt. 52 at 12; Dkt. 54 nos.14, 15-22, 34.

[29] Dkt. 52 at 20.

property" applied under maritime law).[30] Contrary to Cruz's argument, this doctrine doesn't create less protection for injured plaintiffs—it shifts the liability to a different defendant.

Cruz also argues the doctrine doesn't apply because Peterson didn't *complete* its work. She cites Peterson foreman Sixto Perezchica's testimony that he continued to check Peterson's scaffolding in the tank after installation.[31] But "liability for the safety of a contractor's work shifts to the owner *upon acceptance of the work*, that is, when the owner has had an opportunity to examine the work, and thereafter represents that it is safe." *Jones*, 166 Cal. App. 4th at 717 (emphasis added).

The parties agree that *Nassco* "inspected the tank for unsafe conditions daily until the incident."[32] And Peterson's manager, Eric Raymond, stated that Peterson "only certified the staging [(*i.e.*, scaffolding)] safe for access not the tank itself (that is normally noted by the marine chemist and or shipyard QA who certify the tank every 24 hours."[33] Nassco corroborated this point: Deem testified that Nassco has a "competent person" or "QA" who performed a safety inspection in the tank every 24 hours.[34] Perezchica's testimony doesn't create a material dispute that Nassco accepted and controlled Peterson's work.

## C. Peterson didn't owe Cruz a duty to protect her from an open and obvious condition.

Peterson didn't have a duty to shield Cruz from an open and obvious condition. "A competent longshoreman whose work requires him to ascend and descend a ladder must anticipate that any hazard that he observes at the bottom, on ascending, may very well be there when he comes down. Momentarily forgetting the hazard does not erase the notice

---

[30] *Kermarec* held that a shipowner owed a duty of "reasonable care" to "all who are on board" rather than the common law's distinction between "an invitee and a licensee" because the court considered that concept "rooted to the land" and "alien to the law of the sea." 358 U.S. at 630-32. Cruz also cites *Havens*, but that case discusses a lowered negligence standard under the Jones Act for seamen. *Havens v. F/T Polar Mist*, 996 F.2d 215, 218 (9th Cir. 1993).

[31] Dkt. 52-9 at 30, 32 (Perezchica Depo.).

[32] Dkt. 54 no. 14.

[33] Dkt. 52-6 Ex. 39 at 3.

[34] Dkt. 50-7 at 127-131.

given by its presence." *Ludwig v. Pan Ocean Shipping Co.*, 941 F.2d 849, 851 (9th Cir. 1991). Cruz admitted that the scaffolding and ladder entrance "was obvious to her," she didn't think it "was unsafe at any time," and she had safely traversed it "the day before the incident several times without any problems."[35]

Cruz says there's "no open and obvious danger defense" in maritime law.[36] She cites *Martinez v. Korea*, a case decided before *Ludwig*, where the Ninth Circuit reversed summary judgment for a shipowner sued by a longshoreman who fell down an unguarded ladder entrance. The *Martinez* court said the "fact that the ladder opening was obvious to Martinez and other longshoremen working on board the vessel . . . does not necessarily preclude a finding of shipowner negligence." *Id.* at 610. Instead, the court found that, "In this case, we believe that reasonable jurors could differ on whether the ladder opening, although obvious, presented an unreasonably dangerous work environment to experienced longshoremen exercising reasonable care." *Id.*

*Martinez* never says the open and obvious defense isn't applicable in maritime law. On the contrary, *Martinez* found that in two other cases, the Ninth Circuit had "*not* found owners liable for obvious situations that longshoremen should appreciate." *Id.* at 611 (emphasis added).[37] *Ludwig*, citing *Martinez* as a case that went the other way, reversed a district court because it found a longshoreman "is required to be 'mindful' of hazards-not forgetful of them. A shipowner is not required to anticipate the action or inaction of a careless stevedore." *Ludwig*, 941 F.2d at 852.

Cruz says applying *Ludwig* to this case is "intellectually dishonest" because *Ludwig* "deals only with a vessel owner's duty to provide a safe vessel to an expert and experienced

---

[35] Dkt. 54.

[36] Cruz resorts to *Kermarec*'s "inappropriate common-law concepts" language, but "maritime law is an amalgam of traditional common-law rules, modifications of those rules, and newly created rules." *E. River S.S. Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 864-65 (1986). And, as Cruz argues, the court is "free to fashion federal common law remedies." Dkt. 52 at 8.

[37] For example, the Court cites *Bjaranson v. Botelho Shipping Corp., Manila*, 873 F.2d 1204 (9th Cir. 1989) (reversing court's denial of judgment as a matter of law because longshoreman who fell down latter failed to introduce evidence that an experienced worker couldn't navigate a ladder with no handholds with reasonable care.)

stevedore" and this "reduced duty of care does not apply to a non-vessel defendant such as Peterson."[38] But *Ludwig* deals with the same facts as *Martinez*—the case Cruz asks the Court to apply: a longshoreman sues the shipowner for negligence. And the Court sees nothing dishonest about working from factually similar cases like *Ludwig* and *Martinez* where liability was sought against the shipowner instead of a subcontractor. Neither does the Ninth Circuit. *See Peters*, 857 F.2d at 1345 (9th Cir. 1988) (since a shipowner owes the same duty of reasonable care, negligence claims against shipowners are "instructive on the limits of negligence liability in suits against other defendants").

Courts don't hold shipowners liable for open and obvious hazards when they turn over the ship because the owners no longer have "control over the vessel[], or power either to supervise or to control the repair work." *West v. United States*, 361 U.S. 118, 123 (1959). Similarly, Peterson didn't supervise or have any control over Cruz's repair work a month later. Peterson built some scaffolding in the tank according to Nassco's instructions and then turned the space over to Nassco.

The Court reads *Ludwig* and *Martinez* to say that the facts unique to each case matter. Because Cruz has made several damning admissions that she didn't think the space was unsafe, the entrance was obvious, and she previously had no problems working in the area as an experienced tank tester, *Ludwig* provides the better guidance. In *Ludwig,* the worker acknowledged he knew about the hazard at the bottom of the ladder but forgot. Just as a "shipowner may rely on the expertise of longshoremen and leave unremedied conditions that would otherwise be considered unreasonably dangerous to less skilled persons," so too can a subcontractor like Peterson under the facts of this case. *Ludwig*, 941 F.2d at 852.

Cruz has repeatedly represented that she's a "skilled" tank tester and that she'd worked in about two or three tanks a day for six months before the accident.[39] She's also admitted she knew about the ladder entrance and had traversed it several times. Deem also

---

[38] Dkt. 52 at 17.

[39] Dkt. 50-4 at 38.

testified that tanks "throughout the ship" had these specific ladder entrances or baffle holes (*see* picture above). Deem said Nassco wouldn't expect Peterson to tell them, "hey, there's big holes in the water tank. We know that . . . . That's how they're designed." The openings surrounding the ladders are extra large to "allow the liquid to disperse evenly throughout the tank" and all of the large tanks have them.[40]

Cruz's argument boils down to her forgetting that the ladder entrance was at the bottom of the landing. That's not good enough. *Ludwig*, 941 F.2d at 851 (reversing district court for "applying its momentary forgetfulness doctrine")

### D. Peterson didn't owe Cruz a duty to protect her from an inherent risk.

Finally, the Court also agrees that traversing ladder entrances, or baffle holes, that are unique to the tanks on ships, is an inherent part of the job of testing tanks. Since Cruz fell down one of these entrances in the course of her tank-testing duties, Peterson was "under no duty to protect petitioner from risks that were inherent in the carrying out" of her work for Nassco. *West*, 361 U.S. at 123.[41]

Cruz admitted her job required her to navigate ladder entrances like the one pictured above as part of her job carrying out tank-testing work: for six months she had trained in similar tanks and had "traversed holes similar to the hole she allegedly fell through"; she "was aware of such holes and their existence in tanks, never thinking of them as unsafe"; and she "had no problems going up and down the ladders and through the Hole despite the scaffolding."[42] The danger of falling while navigating those ladder entrances was an inherent risk in her job.

In *Peters v. Titan*, machinist Peters was hired to repair a ship's hydraulic system. While descending to the pump room to work on the system, "he lost his footing and slid down [ ] stairs" that were covered in hydraulic fluid. *Peters* at 857 F.2d at 1343. The Ninth

---

[40] Dkt. 50-7 at 134–35.

[41] Cruz says *West* doesn't apply because "the Court held that the defendant had no control over the vessel or the power to either supervise or control the repair work in which plaintiff was engaged." But Peterson didn't "supervise or control the repair work" that Cruz performed either. Nassco did.

[42] Dkt. 54.

Circuit affirmed summary judgment on his negligence claim "because Peters was injured by the very condition he was hired to repair." *Id.* at 1345. Cruz says this doctrine doesn't apply because she wasn't "hired to correct any defective condition, so *Peters* and the entire line of *Peters* cases are inapplicable."[43]

Cruz reads *Peters* too narrowly. Peters was a *machinist*—he was hired to work on the hydraulic system. Cleaning up hydraulic fluid that caused him to slip while navigating stairs was incidental to his primary work of repairing the machinery of the hydraulic system. The same is true of Cruz: she was hired to climb into tanks to test their welds. The ladder entrances, or baffle holes, were unique to tanks. The Court agrees with Peterson that the risk of falling while navigating a tank's ladder entrance in the course of performing tank-testing duties, is an inherent risk of climbing in and out of tanks.

## Conclusion

When "the evidence positively and unequivocally establishes" that an employee is a "loaned servant" the Court may decide the issue as a matter of law. *McCollum*, 339 F.2d at 351 (9th Cir. 1964). The Court finds Cruz was Nassco's borrowed employee and is barred from suing her employer under the Longshore Act. The Court also finds that Peterson Scaffolding didn't owe Cruz a duty to protect her from falling. The Defendants' motions for summary judgment are **GRANTED**.

**IT IS SO ORDERED**.

DATED: March 24, 2017

*Larry A. Burns*

**HONORABLE LARRY ALAN BURNS**
United States District Judge

---

[43] Dkt. 52 at 11.